**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| JOHNNY REID, | ) | CASE NO. 3:17CV01533 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES G. CARR |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Johnny Reid, ("Plaintiff" or "Reid"), challenges the final decision of Defendant,

Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"), denying his

applications for Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and

Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42

U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. §

405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an

automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons

set forth below, the Magistrate Judge recommends that the Commissioner's final decision be

AFFIRMED.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

1

# I.   PROCEDURAL HISTORY

In October 2014, Reid filed an application for POD, DIB, and SSI, alleging a disability onset date of August 28, 2014 and claiming he was disabled due to back pain, ankle pain, osteoarthritis, mood disorder, and generalized anxiety disorder.  (Transcript ("Tr.") 225, 227, 247.)  The applications were denied initially and upon reconsideration, and Reid requested a hearing before an administrative law judge ("ALJ").  (Tr. 146, 161, 174.)

On March 22, 2016, an ALJ held a hearing, during which Reid, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 38.)  On May 18, 2016, the ALJ issued a written decision finding Reid was not disabled.  (Tr. 16.)  The ALJ's decision became final on May 24, 2017, when the Appeals Council declined further review.  (Tr. 1.)

On July 21, 2017, Reid filed his Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 12 and 14.) Reid asserts the following assignment of error:

> Whether the administrative law judge erred in her finding of residual functional capacity where she essentially applied *Drummond* and Acquiescence Ruling 98-4(6) to find Mr. Reid not disabled in the same manner found by a prior administrative law judge, despite
> - new and additional information material to Mr. Reid's physical impairments documenting a worsening of his condition, and
> - mental health and opinion evidence documenting a worsening of his condition?

(Doc. No. 12.)

# II.   EVIDENCE

## A.   Personal and Vocational Evidence

Reid was born in September 1969 and was 46 years-old at the time of his administrative hearing, making him a "younger" person under social security regulations.  (Tr. 30.)  *See* 20

2

C.F.R. §§ 404.1563(c) & 416.963(c).  He has a limited education and is able to communicate in English.  (*Id.*)  He has past relevant work as a stores laborer, hand tube bender, spot welder, pallet builder, and clean up worker.  (*Id.*)

**B.     Medical Evidence[2]**

   **1.        Mental Impairments**

On June 7, 2013, Reid underwent a diagnostic assessment at the Giving Tree, a mental health services facility.  (Tr. 383.)  He reported depression, poor memory, and social isolation, but declined counseling as he was attending AA meetings three times a week.  (Tr. 383, 385.)  He requested case management services at that time.  (Tr. 385.)

On August 13, 2013, Reid underwent a psychiatric evaluation with Carol L. Krieger, PMHCNS, a nurse practitioner at the Giving Tree.  (Tr. 331.)  He reported constant pain, racing thoughts, and poor sleep.  (*Id.*)  He appeared anxious and had poor eye contact during the evaluation.  (*Id.*)  Ms. Krieger diagnosed adjustment disorder mixed with depression and anxiety and alcohol dependancy.  (*Id.*)  She assessed a Global Assessment of Functioning ("GAF") Score[3] of 45-50 and prescribed Celexa.  (Tr. 333, 334.)

Reid visited Ms. Krieger on July 1, 2014, reporting poor sleep and concentration.  (Tr.

---

[2]     The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

[3]     The GAF scale reports a clinician's assessment of an individual's overall level of functioning.  An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments.  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice."  *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

3

387.)  However, his depression was "well managed" and his insight and judgment were fair.  (*Id*.)

Ms. Krieger adjusted his medication dosages.  (*Id*.)  On July 9, 2014, Reid presented to John

Stephens, LSW, for counseling.  (Tr. 388.)  He reported ongoing short term memory issues.  (*Id*.)

Mr. Stephens noted Reid's girlfriend supported Reid and helped him remain focused.  (*Id*.)  Reid

indicated he was using a calendar to keep track of his schedule.  (*Id*.)  He also reported he was

volunteering at a nursing home.  (*Id*.)  Reid returned to counseling on July 30, 2014, indicating

he was "managing well" with the support of his girlfriend.  (Tr. 389.)

On August 19, 2014, Reid visited Ms. Krieger for medication management.  (Tr. 390.)

He reported poor sleep and a stable, but variable, mood.  (*Id*.)  Ms. Krieger adjusted Reid's

medications.  (*Id*.)  Reid returned to Ms. Krieger on September 16, 2014, indicating poor sleep

and mood swings.  (Tr. 392.)  Ms. Krieger noted Reid's recent and remote memory, attention

span, and concentration were adequate.  (*Id*.)  She again adjusted his medications.  (*Id*.)

Reid saw Mr. Stephens for counseling on September 24, 2014, reporting his girlfriend

was managing his medications and appointments.  (Tr. 394.)

Reid visited Ms. Krieger on October 21, 2014, indicating improved sleep and a stable

mood.  (Tr. 395.)  Ms. Krieger switched Reid's antidepressant, but noted Reid's recent and

remote memory was fair and his insight and judgment were good.  (*Id*.)  On October 22, 2014,

Reid attended counseling with Mr. Stephens.  (Tr. 397.)  He indicated he was moody and

irritable, but his depression was "at an all time low."  (*Id*.)

On December 2, 2014, Reid reported memory issues, racing thoughts, and restlessness to

Ms. Krieger.  (Tr. 398.)  His recent and remote memory was fair to poor.  (*Id*.)  Ms. Krieger

adjusted his medications.  (*Id*.)  Reid attended counseling on December 10, 2014, expressing

4

frustration with his recent denial of social security benefits.  (Tr. 400.)

Reid returned to Ms. Krieger on January 13, 2015, indicating he was sleeping "very well" and his mood was stable.  (Tr. 401.)  He reported some memory difficulties, but his attention span and concentration were fair.  (*Id*.)  Ms. Krieger adjusted his medications.  (*Id*.)  Reid attended counseling with Mr. Stephens on January 21, 2015, reporting he was currently in physical therapy, visiting his mom on a regular basis, and "optimistic and positive."  (Tr. 403.)  He returned to Mr. Stephens on March 4, 2015, indicating his physical therapy was not helpful and he was unsure how he could work.  (Tr. 404.)

On March 3, 2015, Reid visited Ms. Krieger, indicating he was doing "very well."  (Tr. 563.)  His "thought processes [were] stable and he [was] very happy with [his] medications."  (Tr. 563.)  Reid exhibited no signs of depression, but his recent and remote memory were poor.  (*Id*.)

On May 19, 2015, Reid returned to Ms. Krieger, again indicating he was doing "very well" and felt he was "stable."  (Tr. 565.)  Reid's recent and remote memory was "sometimes lacking," but his insight, judgment, attention span, and concentration were all fair.  (*Id*.)  Ms. Krieger continued Reid's current medications.  (*Id*.)  On June 30, 2015, Reid's recent and remote memory was "good" and his mood was stable.  (Tr. 567.)

Reid visited his primary care physician, Kim Knight, M.D., in June and July 2015 for medication refills.  (Tr. 640, 649.)  In July 2015, Reid reported memory issues, along with his usual joint pain.  (Tr. 649, 650.)  Dr. Knight noted a normal mood and affect, but observed Reid did "seem to lose concentration and constantly asking for help in remembering things."  (Tr. 652.)  She diagnosed a mild cognitive impairment and prescribed Donepezil.  (Tr. 652, 653.)  On

August 25, 2015, Reid reported continued memory problems to Dr. Knight.  (Tr. 654.)  Dr. Knight increased Reid's Donepezil dosage.  (Tr. 658.)

On August 18, 2015, Reid returned to Ms. Krieger, reporting he was doing well, with adequate memory.  (Tr. 569.)  On November 3, 2015, Reid was stable and "doing well."  (Tr. 571.)  Ms. Krieger noted Reid's pain management doctor had contacted her, requesting she switch Reid's antidepressant to address both his depression and pain.  (*Id.*)  Ms. Krieger subsequently changed Reid's Prozac to Cymbalta, but the remainder of his medications were the same.  (*Id.*)

On October 20, 2015, Reid reported to Dr. Knight his "memory pill" was not helpful.  (Tr. 663.)  Dr. Knight increased Reid's Donepezil dosage.  (Tr. 666.)

Reid visited Ms. Krieger on January 19, 2016, reporting he was "doing well" overall.  (Tr. 574.)  His mood was stable and his recent and remote memory "varie[d]."  (*Id.*)  Ms. Krieger continued Reid's same medications.  (*Id.*)

On March 8, 2016, Ms. Krieger filled out a "Medical Source Statement Concerning the Nature and Severity of an Individual's Mental Impairments" prepared by Reid's attorney.  (Tr. 576-578.)  Ms. Krieger found the following regarding Reid:

- He can consistently understand, remember, and follow one or two step instructions;

- He would be off-task 10 -15% of the workday;

- He requires close supervision (re-direction multiple times per day, on a continuing basis) in order to stay on task;

- He would be absent, late, or leave early at least twice a month due to psychiatric based symptoms;

- He is unable to consistently interact with others in a manner that is

6

appropriate to customer expectations, and would not be successful
in working with the public;

- He can occasionally have superficial interactions with co-workers
and supervisors; and

- He is unable to perform an average-paced job without a reduction in
productivity of 15-20% compared to an unimpaired worker.

(*Id*.)

### 2.     Physical Impairments

Reid underwent a series of x-rays on March 11, 2014.  (Tr. 405, 406, 408.)  His cervical

spine x-ray revealed severe degenerative spondylosis with reversal of the normal cervical

lordosis.  (Tr. 408.)  His lumbar spine x-ray indicated mild to moderate degenerative spondylosis,

most significant at L5-S1.  (Tr. 405.)  His thoracic spine x-ray was normal.  (Tr. 406.)

On April 15, 2014, Reid underwent an initial pain management evaluation with William

Hogan, M.D.  (Tr. 434-435.)  He reported lower back and neck pain stemming from a 1990

motor vehicle accident.  (Tr. 434.)  He indicated constant pain, rating it as a 6/10.  (*Id*.)  On

examination, Reid's lumbosacral spine and paraspinal musculature were tender to palpation.  (Tr.

435.)  His pain was exacerbated with extension of the lumbar spine and somewhat relieved by

forward flexion.  (*Id*.)  He had full strength in all muscle groups, normal sensation in his

bilaterally lower extremities, minimal edema in his legs, and negative bilateral straight leg raises.

(*Id*.)  His cervical spine was tender to palpation and had a diminished range of motion.  (*Id*.)  Dr.

Hogan reviewed Reid's March 2014 x-rays and recommended facet joint injections.  (*Id*.)  He

prescribed Tramadol and Neurontin.  (*Id*.)

Reid underwent a round of lumbar spine facet joint injections on May 2, 2014 and May

23, 2014.  (Tr. 437, 439.)  On June 11, 2014, Reid returned to pain management and treated with

7

nurse practitioner Heather Auxier, CNP.  (Tr. 441.)  He reported lower back pain radiating down his leg.  (*Id*.)  He indicated significant relief following his first injection, but was uncertain if the second injection provided any relief.  (*Id*.)  On examination, Reid had a limited lumbar spine range of motion, decreased strength in his bilateral lower extremities, positive straight leg raises, and an antalgic gait.  (*Id*.)  Ms. Auxier ordered a lumbar MRI or CT scan and increased Reid's Gabapentin dosage.  (*Id*.)

On June 17, 2014, Reid visited Dr. Knight for back pain and leg cramps.  (Tr. 584.)  On examination, he had a stiff neck and tender spine, with poor range of motion.  (Tr. 585.)  He had positive straight leg raises.  (*Id*.)  Dr. Knight recommended cervical traction.  (Tr. 587.)

A July 14, 2014 lumbar spine CT scan revealed (1) degenerative disc disease at the L3-4 and L4-5 levels; (2) moderate central canal and right foraminal narrowing and moderate diffuse disc bulging at the L-4 levels; and (3) suspected neural foraminal impingement, most notable at L3-4.  (Tr. 443.)

On July 16, 2014, Reid returned to Ms. Auxier for pain management.  (Tr. 442.)  On examination, his gait was non-antalgic, but he had a sensory deficit, slightly decreased strength, and a positive straight leg raise on the right side.  (*Id*.)  Ms. Auxier recommended a lumbar nerve root injection.  (*Id*.)

Reid visited Dr. Knight on September 8, 2014, for medication refills.  (Tr. 593.)  On examination, he had a poor range of motion in his neck and spine.  (Tr. 595.)  Dr. Knight prescribed Tramadol.  (*Id*.)  On September 22, 2014, Dr. Knight prescribed Tramadol and Gabapentin.  (Tr. 600.)  On October 17, 2014, Reid underwent a right L3 and L4 nerve root injection.  (Tr. 444.)

8

Reid returned to Dr. Knight on October 22, 2014, indicating his Tramadol was not helpful.  (Tr. 601.)  Dr. Knight observed a stiff neck, tender spine, and poor spinal range of motion.  (Tr. 603.)  She renewed his Tramadol prescription.  (*Id*.)  On November 7, 2014, Reid underwent another right L3 and L4 nerve root injection.  (Tr. 446.)

On November 26, 2014, Reid visited Dr. Knight for medication refills.  (Tr. 605.)  Dr. Knight again noted a stiff neck, tender back, and poor spinal range of motion.  (Tr. 606.)  She renewed Reid's Tramadol prescription.  (Tr. 608.)

On December 3, 2014, Reid followed up with Ms. Auxier at pain management.  (Tr. 448.)  Reid reported improvement in his leg pain following the nerve root injections, but continued back pain.  (*Id*.)  On examination, his gait was non-antalgic and he had tenderness in his lumbar spine.  (*Id*.)  Ms. Auxier concluded "a conservative approach would be most appropriate for the patient" and prescribed Elavil.  (*Id.*)

Reid visited Dr. Knight on December 29, 2014.  (Tr. 610.)  On examination, he continued to have poor range of motion in his neck and back, with a positive straight leg raise, lower back spasms, and a limited range of motion in his hips.  (Tr. 612.)  Dr. Knight renewed Reid's Tramadol prescription and also prescribed a course of steroids.  (Tr. 612, 613.)

From January 5, 2015 through May 13, 2015, Reid attended 12 physical therapy sessions.  (Tr. 455.)  He either met or partially met his therapy goals, however, he did not think his home exercise program was effective at controlling his pain.  (Tr. 454.)  His physical therapist, Dave Moore, PT, concluded his land-based therapy was unsuccessful and recommended Reid try aquatic therapy.  (Tr. 455.)

During this time, Reid continued to regularly visit pain management and Dr. Knight.  On

January 23, 2015, Reid visited pain management physician Dr. Hogan, reporting little relief from his Elavil.  (Tr. 449.)  On examination, Reid had a positive straight leg raise, a right-sided sensory deficit, and a non-antalgic gait.  (*Id*.)  Dr. Hogan noted Reid was "doing fairly well with regards to his facetogenic back pain but he does have significant pain associated with lumbar disc displacement."  (*Id*.)  He recommended Reid undergo caudal epidural steroid injections.  (*Id*.)

On January 27, 2015, Reid saw Dr. Knight, again indicating his Tramadol was not effective.  (Tr. 619.)  On examination, Reid had a stiff neck, tender spine, lower back muscle spasms, and a positive straight leg raise on the right side.  (Tr. 621.)  Dr. Knight prescribed Tramadol.  (*Id*.)

Reid began to see a new pain management doctor, Kaveh Nabavighadi, M.D., on February 12, 2015.  (Tr. 527.)  He reported the TENS unit used at physical therapy was helpful. (*Id*.)  On examination, Reid had bilateral lumbar paraspinal tenderness, pain over his bilateral sacroiliac joints, and muscle spasms in his back.  (*Id*.)  His straight leg raises were negative and he had full strength and grossly intact sensation in his legs.  (Tr. 527, 528.)  Dr. Nabavighadi prescribed a TENS unit and recommended facet steroid injections.  (Tr. 528.)

On February 23, 2015, Reid returned to Dr. Knight for a renewal of his Tramadol prescription.  (Tr. 625, 626.)  Dr. Knight recommended Reid continue attending physical therapy and using a TENS unit, as it was alleviating his pain.  (Tr. 626.)

Reid underwent bilateral lumbar facet steroid injections at L4-5 and L5-S1 on March 13, 2015.  (Tr. 450.)  On March 23, 2015, Dr. Knight noted Reid had a stiff neck, tender spine, lower back spasms, and a positive straight leg raise on the right side.  (Tr. 629.)

Reid followed up with Dr. Nabavighadi on March 27, 2015.  (Tr. 529.)  He relayed his

10

most recent injection provided "outstanding relief" for a day, but now was providing 40-50%
pain relief.  (*Id*.)  On examination, Reid had full strength throughout his muscle groups, intact
sensation, and bilateral lumbar paraspinal tenderness.  (*Id*.)  Dr. Nabavighadi recommended Reid
undergo another facet joint injection and increased his Gabapentin dosage.  (Tr. 530.)  Reid
subsequently underwent a second bilateral lumbar facet steroid injection on April 24, 2015.  (Tr.
452.)

On April 27, 2015, Reid visited Dr. Knight, reporting he was still in physical therapy, was
exercising regularly, and was able to walk.  (Tr. 631.)  Dr. Knight prescribed Diclofenac, an anti-
inflammatory.  (Tr. 634.)  Reid saw Dr. Knight again on May 26, 2015, reporting he was
attempting to work around the house and was walking daily.  (Tr. 636.)  On examination, Reid
had a stiff neck and tender spine with poor range of motion, lower back spasms, and a positive
straight leg raise on the right side.  (Tr. 638.)  Dr. Knight prescribed Gabapentin.  (Tr. 639.)

Reid returned to Dr. Nabavighadi on May 29, 2015, indicating that while he still had back
pain, his neck pain had become a bigger concern.  (Tr. 531.)  On examination, he had cervical
paraspinal tenderness.  (*Id*.)  Dr. Nabavighadi prescribed neck physical therapy and prescribed
Mobic.  (Tr. 532.)  The doctor discontinued Reid's Diclofenac prescription, continued his
Gabapentin, and ordered a cervical spine injection and lumbar MRI.  (*Id*.)

On September 25, 2015, Reid reported to Dr. Nabavighadi his neck was feeling better so
he decided against any injections in the cervical spine.  (Tr. 534.)  Dr. Nabavighadi noted Reid's
insurance had denied approval for a lumbar MRI, as Reid needed to attempt physical therapy
first.  (*Id*.)  On examination, Reid had bilateral lumbar and cervical spine tenderness, full strength
throughout, and intact sensation.  (Tr. 535.)

11

From October 6, 2015 through November 24, 2015, Reid attended 15 visits of physical therapy, 10 of which were aquatic therapy.  (Tr. 497.)  During therapy, Reid made significant progress in his back range of motion, but it was still not within normal limits.  (*Id*.)  His strength was good, but bending provoked pain.  (*Id*.)  Three weeks into therapy, Reid visited Dr. Nabavighadi, reporting no improvement from the therapy.  (Tr. 537.)  He rated his pain as 8/10, but Dr. Nabavighadi observed full strength throughout.  (*Id*.)  Dr. Nabavighadi recommended he finish physical therapy and obtain a lumbar MRI.  (Tr. 538.)

On December 8, 2015, Reid visited pain management doctor Vimal Kumar, M.D.  (Tr. 541.)  On examination, he had "quite a bit" of paraspinal tenderness, but full strength, good muscle bulk, and intact sensation.  (Tr. 542.)  Dr. Kumar decreased Reid's medication dosages and ordered a lumbar MRI.  (Tr. 542, 543.)

A January 25, 2016 lumbar MRI revealed (1) borderline to mild canal stenosis at L3-4 with moderate right neural foraminal narrowing; (2) borderline canal stenosis at L4-5; (3) moderate right neural foraminal narrowing at L4-5; (4) and elevated L4-5 nerve roots, but no nerve exiting nerve root impingement.  (Tr. 546-547.)

On February 2, 2016, Reid followed up with Dr. Knight for medication refills.  (Tr. 680.)  He reported constant lower back and neck pain.  (*Id*.)  He relayed his pain and muscle spasm had increased since Dr. Kumar decreased his Gabapentin dosage.  (*Id*.)  On examination, Reid had muscle spasms in his lower back and a positive straight leg raise on the right.  (Tr. 682.)  Dr. Knight resumed Reid's previous Gabapentin dosage.  (Tr. 683.)

Reid indicated continued pain to Dr. Knight on March 4, 2016.  (Tr. 684.)  He requested a referral to another pain management physician.  (Tr. 687.)  Dr. Knight referred Reid to a

neurologist for a second opinion and prescribed Celecoxib. (*Id.*)

**C.      State Agency Reports**

**1.      Mental Impairments**

On December 23, 2014, state agency physician Karla Voyten, Ph.D., reviewed Reid's medical records and completed a Psychiatric Review Technique ("PRT") and Mental Residual Functional Capacity ("RFC") Assessment. (Tr. 99-100, 102.) In the PRT, Dr. Voyten concluded Reid had (1) mild restrictions in activities of daily living; (2) mild difficulties in maintaining social functioning; (3) moderate difficulties in maintaining concentration, persistence, or pace; and (4) no episodes of decompensation. (Tr. 99.) In the Mental RFC, Dr. Voyten found as follows:

> The assessment given is an adoption of the ALJ's decision dated 8-27-2014. The assessment is being adopted under AR 98-4 Drummond Ruling.
>
> Per the ALJ decision, the [claimant] is limited [to] work that is simple, routine, and repetitive tasks in a work enviromnent[sic] that is free from fast paced production requirements, such as moving assembly lines and conveyor belts, involving only work related decisions with few, if any, workplace changes. The individual should not interact with the general public. The individual can have occasional interactions with supervisors and coworkers.

(Tr. 102.)

On March 26, 2015, state agency physician Kristen Haskins, Psy.D., reviewed Reid's medical records and completed a PRT and Mental RFC assessment. (Tr. 123-124, 126.) Dr. Haskins reached the same conclusions as Dr. Voyten, above. (*Id.*)

**2.      Physical Impairments**

On December 16, 2014, state agency physician Leon D. Hughes, M.D., reviewed Reid's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment.

13

(Tr. 101-102.)  Dr. Hughes adopted the "ALJ decision dated 8/27/14" as "Drummond Ruling 98-4 applies."  (Tr. 101.)  In that decision, the ALJ found Reid had the "residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except: the individual has a postural limitation of no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs; frequent balancing, stooping, kneeling, crouching and crawling; and an environmental limitation to avoid all exposure to hazards, such as moving machinery and unprotected heights.  Additionally, the individual has an environmental limitation to avoid concentrated exposure to irritants such as odors, fumes, and gases.  The individual may not engage in commercial driving."  (Tr. 101-102.)

On March 23, 2015, state agency physician Gerald Klyop, M.D., reviewed Reid's medical records and completed a Physical RFC assessment.  (Tr. 125.)  Dr. Klyop reached the same conclusions as Dr. Hughes, above.  (*Id*.)

**D.**     **Hearing Testimony**

During the March 22, 2016  hearing, Reid testified to the following:

- He has a tenth grade education.  (Tr. 43.)  He took the GED examination once, but failed.  (*Id*.)  He has held various jobs, including stocking shelves, factory work, cleaning, bending metal, and welding.  (Tr. 44-47.)

- His back and neck pain prevent him from working.  (Tr. 48.)  He was involved in a car accident in 1990 in which he broke his back, neck, six ribs, and his right ankle.  (*Id*.)  His pain is constant.  (Tr. 49.)  He spends about 10 hours a day sitting with his feet elevated to alleviate his pain.  (*Id*.)

- He has metal pins in his right ankle.  (Tr. 50.)  His ankle pain increases in damp weather.  (*Id*.)

- He has numbness in his hands and struggles to pick up and hold small objects. (Tr. 55.)

- He has "good days" and "bad days."  (Tr. 50-51.)  On his bad days, he can

14

"hardly get up out of bed."  (Tr. 51.)  He estimates he has 4-5 bad days a week.  (*Id*.)

- He has received injections and physical therapy for his pain.  (Tr. 51.)  He did not find either of these treatment modalities helpful.  (*Id*.)

- He can walk for 10-15 minutes before he begins to have trouble with his right leg.  (Tr. 52.)  He can sit for 10 minutes.  (*Id*.)  He can stand for 20-30 minutes.  (Tr. 53.)  He can lift 15-20 pounds, but not on a consistent basis.  (*Id*.)

- He has had trouble with his memory since his 1990 car accident.  (*Id*.)  He cannot remember "days, numbers, people's names, places" and his "mind is always running in a different direction when [he is] trying to concentrate."  (Tr. 53-54.)

- He does not have difficulty getting along with others or following instructions.  (Tr. 54.)  He does become confused when paying bills, and his roommate assists him with this task.  (Tr. 57.)  His roommate also reminds him to take his medications and attend appointments.  (Tr. 61, 62.)

- He has anxiety and sees a psychiatrist and counselor once a month.  (Tr. 59.)

- He washes the dishes, does his laundry, and performs light housework.  (Tr. 56.)  He does experience back pain while performing these activities.  (*Id*.)

- Since his last ALJ hearing, his back has gotten worse, his hands are hurting more, and his memory has declined.  (Tr. 58, 63.)

The VE testified Reid had past work as a pallet builder, welder, hand tube bender, cleanup worker, and floors laborer.  (Tr. 717.)  The ALJ then posed the following hypothetical question:

Please assume a hypothetical individual of the claimant's age, education and work experience.  The individual can perform medium work as defined in the regulations, except the individual has a postural limitation of no climbing of ladders, ropes, or scaffolds?  Occasional climbing of ramps and stairs.  Frequent balancing, stooping, kneeling, crouching, and crawling, and an environmental limitation to avoid all exposure to hazards such as dangerous moving, mechanical parts, and unprotected heights.  Additionally, the individual has an environmental limitation to avoid concentrated exposure to irritants such as dust, odors, fumes and gases.  The individual is limited to work that is simple, routine, and repetitive tasks, in a work environment that

15

is free from fast-paced production requirements, such as moving assembly
lines and conveyor belts, involving only work related decisions with few, if
any, workplace changes.  The individual may not engage in commercial
driving, and should not interact with the general public.  The individual can
occasionally interact with supervisor[s] and coworkers.

(Tr. 717-718.)

The VE testified the hypothetical individual would be able to perform Reid's past work as

hand tube bender and store laborer.  (Tr. 718.)  The VE further explained the hypothetical

individual would also be able to perform other representative jobs in the economy, such as box

bender (medium, unskilled), return checker (medium, unskilled), and deep fat fry cook (medium,

unskilled).  (Tr. 718-719.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the

time of disability and must prove an inability to engage "in substantial gainful activity by reason

of any medically determinable physical or mental impairment," or combination of impairments,

that can be expected to "result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when

he became disabled; and (3) he filed while he was disabled or within twelve months of the date

the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905;

*Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a

claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and

416.1201.

16

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).   Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Reid was insured on his alleged disability onset date, August 28, 2014, and remained insured through March 31, 2016, his date last insured ("DLI.")  (Tr. 21.)  Therefore, in order to be entitled to POD and DIB, Reid must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period

17

precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988);

*Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through March 31, 2016.

2.    The claimant has not engaged in substantial gainful activity since August 28, 2014, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: cervical spondylosis, cervical facet syndrome, osteoarthritis of the neck; lumbar spondylosis, lumbosacral osteoarthrosis, lumbar radiculopathy, lumbar disc displacement, lumbar stenosis, lumbar degenerative disc disease; status post fractured spine, with back pain and hand numbness; allergic rhinitis; hypertension; mood disorder with depressive features; generalized anxiety disorder; and mild cognitive impairment (20 CFR 404.1520(c) and 416.920(c)).[4]

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c), except: the claimant has postural limitations of no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs; frequent balancing stooping, kneeling, crouching, and crawling; and an environmental limitation to avoid all exposure to hazards, such as dangerous moving machinery and unprotected heights. Additionally, the claimant has an environmental limitation to avoid concentrated exposure to irritants such as odors, dusts, fumes, and gases. The claimant is limited to work with simple, routine, and repetitive tasks in a work environment that is free from fast-paced production requirements, such a moving assembly lines and conveyor belts, involving only work-related

---

[4]    The ALJ included a footnote to this finding which read as follows: "The undersigned notes that although different language may have been used, the severe impairments are fundamentally the same as the prior ALJ found." (Tr. 22.)

decisions with few, if any, workplace changes. The claimant may not engage in commercial driving and should not interact with the general public. The claimant can have occasional interactions with supervisors and coworkers.

6. The claimant is capable of performing his past relevant work as a stores laborer (Dictionary of Occupational Titles (DOT) 922.687-058) and hand tube bender (DOT 709.687-050). This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7. The claimant has not been under a disability, as defined in the Social Security Act, from August 28, 2014, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 21-31.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec*., 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs*., 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston*

19

*v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If

relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### A.  *Drummond*

Reid argues the ALJ improperly adopted the prior ALJ's RFC pursuant to *Drummond v. Comm'r of Soc. Sec.,* 126 F.3d 837 (6th Cir. 1997) in respect to both his physical and mental impairments.  (Doc. No. 12 at 11, 15.)  Moreover, Reid argues the ALJ "used the wrong standard of analysis," as she "looked at whether the evidence documented significant change."  (*Id*. at 12.) With regard to his physical impairments, Reid argues the record shows his condition worsened, citing a lumbar CT and MRI, objective findings of a right-sided sensory deficit, and a change in the "intensity" of his treatment.  (*Id*. at 13, 14.)  With regard to his mental impairments, Reid emphasizes his updated mental health treatment notes and the opinion evidence from his treating psychiatric nurse practitioner.  (*Id*. at 15-17.)

The Commissioner asserts Reid fails to carry his burden of demonstrating a new or worsening condition since the prior ALJ decision.  (Doc. No. 14 at 20.)  She maintains the ALJ properly applied *Drummond*, noting Reid "cites no authority for his proposition that the ALJ's phrasing constituted a departure from the standard articulated" in *Drummond*.  (*Id*. at 14.)  The Commissioner further asserts the ALJ properly discounted the treating nurse practitioner's opinion.  (*Id*. at. 20.)  Thus, the Commissioner argues the ALJ properly evaluated Reid's physical and mental impairments and did not err in adopting the RFC set forth in the previous ALJ

21

decision.  (*Id*. at 16, 20.)

In *Drummond* , the Sixth Circuit held that "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances."  *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 842 (6th Cir. 1997)(relying on *Senters v. Sec'y of Health & Human Servs.*, 1992 WL 78102 (6th Cir. Apr. 17, 1991) (per curiam).  *See also Dennard v. Sec'y of Health & Human Servs.*, 907 F.2d 598 (6th Cir.1990) (per curiam); *Blankenship v. Comm'r of Soc. Sec.*, 624 Fed. Appx. 419, 425 (6th Cir. Aug. 26, 2015).  In that case, Drummond's initial claim for SSI was denied when an ALJ found that Drummond retained a RFC for sedentary work.  *Drummond*, 126 F.3d. at 838. When Drummond later re-filed her disability claim, a second ALJ found that Drummond retained a RFC suitable for medium-level work—unlike the sedentary RFC finding of the first ALJ—and denied the re-filed claim.  *Id*. at 839.  After explaining that "*[r]es judicata* applies in an administrative law context following a trial type hearing," the Sixth Circuit held that the second ALJ was bound to the sedentary RFC determination of the first ALJ because there was no new or additional evidence of an improvement in Drummond's condition.  *Id*. at 841–842.  "Just as a social security claimant is barred from relitigating an issue that has been previously determined, so is the Commissioner." *Id*.

In response to *Drummond*, the Social Security Administration promulgated Acquiescence Ruling 98–4(6). The Administration explained:

> This Ruling applies only to disability findings in cases involving claimants who reside in Kentucky, Michigan, Ohio, or Tennessee at the time of the determination or decision on the subsequent claim at the initial, reconsideration, ALJ hearing or Appeals Council level. It applies only to a finding of a claimant's residual functional capacity or other finding required at a step in the sequential evaluation process for determining disability provided under 20 CFR 404.1520, 416.920 or

22

416.924, as appropriate, which was made in a final decision by an ALJ or the Appeals Council on a prior disability claim.

When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

AR 98–4(6) (S.S.A.), 1998 WL 283902, at *3 (1998) (emphasis added) (footnote omitted).

As the Sixth Circuit recently explained, "[r]ead together, *Drummond* and Acquiescence Ruling 98–4(6) clearly establish that a subsequent ALJ is bound by the legal and factual findings of a prior ALJ unless the claimant presents new and material evidence that there has been either a change in the law or a change in the claimant's condition." *Blankenship*, 624 Fed. Appx. at 425. "New" evidence is evidence " 'not in existence or available to the claimant at the time of the administrative proceeding that might have changed the outcome of that proceeding.' " *Schmiedebusch v. Comm'r of Soc. Sec*., 2013 WL 5749156 at * 9 (6th Cir. Oct. 24, 2013) (quoting *Sullivan v. Finkelstein*, 496 U.S. 617, 626, 110 S.Ct. 2658, 110 L.Ed.2d 563 (1990)). With regard to materiality, a claimant "must demonstrate that there was a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore v. Sec'y of Health & Human Servs*., 865 F.2d 709, 711 (6th Cir.1988). *See also Schiedebusch*, 2013 WL 5749156 at * 9.

The Court will address Reids's arguments regarding the ALJ's application of *Drummond* in the context of his physical and mental impairments separately, below.

### Physical Impairments

Reid filed his first application for POD, DIB, and SSI in September 2012, alleging

23

disability since December 2011.  (Tr. 70.)  In a written decision dated August 27, 2014, an ALJ

considered the medical evidence regarding Reid's impairments.  (Tr. 70-89.)  Based on this

evidence, as well as opinion evidence, the ALJ determined Reid had the following severe

impairments: degenerative disc disease/lumbago, status post fractured spine with back pain and

hand numbness, osteoarthritis, allergic rhinitis, hypertension, substance dependancy (alcohol),

mood disorder with depressive features, and generalized anxiety disorder.  (Tr. 72.)

> With regard to Reid's physical impairments, the ALJ determined at step three Reid did

not meet or equal any criteria for Listings 1.02, 1.04, 3.01, 4.06, or 14.09.  (Tr. 73-74.)  At step

four, the ALJ summarized Reid's physical symptoms and self-reported limitations as follows:

> With respect for physical functions, the claimant reported that he had
> difficulties sitting or standing for extended periods of time, had frequent
> episodes of shortness of breath, and had difficulty lifting items due to back
> and side pain . . . The claimant also testified that he had difficulties walking
> more than one city block, had troubles with standing due to stiffness, and
> was limited to lifting and carrying approximately 10-20 pounds
> occasionally.

(Tr. 78.)  The ALJ found, however, Reid's statements concerning the intensity, persistence, and

limiting effects of these symptoms were "not entirely credible."  (Tr. 86.)  In support of this

conclusion, the ALJ noted Reid's March 2014 x-rays, which revealed (1) mild to moderate

degenerative spondylosis in the lumbar spine; (2) severe degenerative changes in the cervical

spine; and (3) no abnormalities in the thoracic spine.  (Tr. 79.)  The ALJ also discussed numerous

physical examination findings in the record.  While the ALJ acknowledged these examinations

documented pain, muscle spasms, tenderness, and decreased range of motion, the ALJ

emphasized many normal examination findings in Reid's treatment notes, including 5/5 muscle

strength in all major muscle groups, normal sensory function in the legs, normal gait, normal grip

24

strength, and normal reflexes.  (Tr. 79-80, 83.)  The ALJ also noted Reid took medications and

received facet joint injections, but failed to comply with recommendations for physical therapy.

(*Id*.)  The ALJ concluded "although the claimant was assessed with degenerative change in the

neck or lower back region, treatment notes from the Bellevue Hospital and Dr. Ramakrishnan's

office shows that the claimant did not require surgical intervention to appreciate some relief from

his lower back symptoms."  (Tr. 86.)

> The ALJ assessed the following physical restrictions in the RFC:
>
> After careful consideration of the entire record, the undersigned finds that
> the claimant has the residual functional capacity to perform medium work
> as defined in 20 CFR 404.1567(c) and 416.967(c) except: the individual has
> a postural limitation of no climbing of ladders, ropes, or scaffolds;
> occasional climbing of ramps and stairs; frequent balancing, stooping,
> kneeling, crouching, and crawling; and an environmental limitation to avoid
> all exposure to hazards, such a moving machinery and unprotected heights.
> Additionally, the individual has an environmental limitation to avoid
> concentrated exposure to irritants such as odors, dusts, fumes, and gases.

(Tr. 77.)  Based on the testimony of the VE, the ALJ concluded Reid was able to perform

representative jobs in the economy such as stores laborer and hand packager.  (Tr. 87.)

Accordingly, the ALJ determined Reid "has not been under a disability, as defined in the Social

Security Act, from December 31, 2011, through the date of this decision."  (Tr. 88.)

> Reid filed his second application for POD, DIB, and SSI in October 2014, alleging a

disability onset date of August 28, 2014 (one day after the previous ALJ decision).  (Tr. 225,

227.)  In a written decision dated May 18, 2016, the second ALJ acknowledged the previous ALJ

decision and found as follows:

> The claimant filed prior applications for a period of disability, disability
> insurance benefits, and supplemental security income, which were denied
> by an Administrative Law Judge on August 27, 2014, at step five of the
> sequential disability evaluation (B1A).  The prior decision is not being

25

> reopened or revised, because good cause is not established (20 CFR
> 404.988, 416.1488 *et seq*.).  Pursuant to Acquiescence Rulings 98-3(6) and
> 98-4(6), absent new and material evidence documenting a significant
> change in the claimant's condition, the residual functional capacity and
> certain other findings established in a prior hearing decision by an
> Administrative Law Judge are binding on the present adjudicator, provided
> that the new claim arises under the same title of the Act.  Such strictures are
> discussed below, where appropriate.

(Tr. 19.)  The ALJ found Reid suffered from the severe impairments of cervical spondylosis,

cervical facet syndrome, osteoarthritis of the neck, lumbar spondylosis, lumbosacral

osteoarthrosis, lumbar radiculopathy, lumbar disc displacement, lumbar stenosis, lumbar

degenerative disc disease, status post fractured spine with back pain and hand numbness, allergic

rhinitis, hypertension, mood disorder with depressive features, generalized anxiety disorder, and

mild cognitive impairment.  (Tr. 21-22.)  The ALJ determined Reid's impairments, considered

singly and in combination, did not meet or equal any Listing.  (Tr. 23.)

     The ALJ further discusses the medical evidence regarding Reid's physical and mental

impairments.  With regard to Reid's physical impairments, the ALJ analyzed Reid's self-reported

symptoms and limitations and the medical evidence.  She discussed his March 2014 x-rays, as

well as his July 2014 lumbar CT scan, and January 2016 lumbar MRI.  (Tr. 26, 28.)  She

reviewed his pain management treatment notes, focusing on the objective findings.  (*Id*.)  The

ALJ also discussed Reid's multiple rounds of injections, physical therapy, and TENS unit usage.

(Tr. 28.)

     As to the opinion evidence, the ALJ explained the state agency physicians "all

concluded that no new and material evidence has been submitted that would change the residual

functional capacity found in the prior decision (B2A, B3A, B6A, B7A).  These opinions have

been given great weight, as the evidence submitted subsequent to the state agency's reviews

26

would not alter that conclusion, as discussed in more detail below."  (Tr. 29.)

 The ALJ then acknowledged the prior ALJ decision and related RFC, and concluded the following:

> Although the claimant has reported worsening back and neck symptoms, his objective findings have not changed significantly since the prior decision was issued, as shown by the imaging studies (B7F/1-3; B9F/10; B13F/21) and his clinical findings, which have remained relatively mild (B9F, B13F), as discussed above.  The claimant has not required neck or back surgery during the time period at issue; there has been no appreciable change in his level of treatment since the prior decision.
>
> ***
>
> [T]he undersigned does not find that new and material evidence has been submitted documenting a significant change in the claimant's condition since that decision was issued.  Therefore, the residual functional capacity found in the prior decision is adopted pursuant to AR 98-4(6).

(*Id*.)

 As an initial matter, Reid argues the ALJ's use the phrase "significant change" when applying *Drummond* "effectively held Mr. Reid to a higher level of proof than required by law." (Doc. No. 12 at 12.)  He contends there is "nothing in the *Drummond* standard that requires 'significant' change," as Acquiescence Ruling 98–4(6) provides "that *res judicata* applied to a previous finding unless 'there is new and material evidence relating to such a finding."  (*Id*.)  The Court disagrees.  Courts within this Circuit have used the word "significant" when conducting analysis under *Drummond*.  *See Irving v. Berryhill,* 2017 WL 2859799 at *8 (N.D. Ohio June 9, 2017)(Report and Recommendation adopted June 30, 2017)("In *Drummond*, the Sixth Circuit looked to whether substantial evidence was introduced to show that Plaintiff's condition *changed significantly* between the two hearing dates.")(emphasis added); *Cooper v. Colvin,* 2016 WL 828784 at *9 (N.D. Ohio Mar. 3, 2016)("The burden Plaintiff must overcome to be successful on

27

his subsequent DIB and SSI applications is to demonstrate that Plaintiff's condition has *changed significantly* (here, worsened) since the November 2011 Decision by presenting new material evidence.")(emphasis added); *St. James v. Comm'r of Soc. Sec.,* 2014 WL 1305032 *2 (E.D. Mich. Feb. 4, 2014)(Report and Recommendation adopted Mar. 31, 2014)("Two of these deviations, namely the frequency of changing position and the limitations regarding gripping and grasping represent *significant changes*, and therefore violate *Drummond*.")(emphasis added); *Reese v. Comm'r of Soc. Sec.,* 2012 WL 4023396 *10 (N.D. Ohio June 5, 2012)(Report and Recommendation adopted Sept. 12, 2012)("Because the Court finds that the ALJ's ruling that Plaintiff's condition had not *significantly* worsened since 2002 is supported by the record, the ALJ's application of the ruling in *Drummond* was proper")(emphasis added).  Courts within this Circuit have also upheld ALJ decisions which used the phrase "significant change" when applying *Drummond* analysis.  *See Robinson v. Comm'r of Soc. Sec.,* 2015 WL 5022299 at *5 (W.D. Mich, Aug. 24, 2015); *Humphrey v. Comm'r of Soc. Sec.,* 2017 WL 3821457 at *5-6 (S.D. Ohio Sept. 1, 2017); *Irving,* 2017 WL 2859799 at *5.  Reid's argument regarding the semantics of the phrase "significant change" is not well-taken.  The Court finds the ALJ applied the proper standard when conducting analysis under *Drummond*.

Further, the Court finds the ALJ's determination there was no new and material evidence demonstrating a worsening of Reid's physical impairments is supported by substantial evidence.  As the ALJ noted, the objective medical evidence, physical examination findings, and treatment regimen remained consistent with his previous application.  (Tr. 29.)  As to the objective medical evidence, the March 2014 x-rays reveal severe degenerative changes in the cervical spine and mild to moderate degenerative changes in the lumbar spine.  (Tr. 405, 408.)

28

The July 2014 CT scan of the lumbar spine indicates degenerative disc disease at the L3-4 and L4-5 levels, moderate central canal and right foraminal narrowing and moderate diffuse disc bulging at the L3-4 levels, and suspected neural foraminal impingement, most notable at L3-4. (Tr. 443.)  Reid's January 2016 lumbar MRI reveals (1) borderline to mild canal stenosis at L3-4 with moderate right neural foraminal narrowing; (2) borderline canal stenosis at L4-5; (3) moderate right neural foraminal narrowing at L4-5; (4) and elevated L4-5 nerve roots, but no nerve exiting nerve root impingement.  (Tr. 546-547.)  As these are all different diagnostic testing methods, the results are not expected to replicate each other.  However, they are generally consistent, as they each indicate moderate degenerative changes in the lumbar spine.  When comparing the CT scan and the MRI, both confirm moderate right foraminal narrowing and mild left foraminal narrowing at the L3-4 level.  (Tr. 443, 546.)  The CT scan does indicate a milder degree of foraminal narrowing at the L4-5 level than the MRI.  (*Id.*)  However, as these are different types of tests, the fact there is a slight difference at the L4-5 level does not necessarily mean Reid's condition has worsened.  Moreover, neither test indicates Reid has developed a disc herniation or a significant progression in his degenerative disc disease since the prior ALJ decision.

Similarly, the physical examination findings before the most recent ALJ document Reid's continued complaints of chronic back and neck pain.  These pain complaints were acknowledged and discussed by both the previous and the most recent ALJ.  (Tr. 79-80, 26, 28.) Like the treatment records before the previous ALJ, Reid's physical examination findings in his updated records consistently showed pain, tenderness, and limited range of motion, but also contained many normal findings.  (Tr. 79, 28.)  For example, his pain management doctors most

29

often noted full strength in his lower extremities and intact sensation.  (Tr. 435, 527, 528, 529, 535, 537, 538, 542.)

Reid emphasizes the fact the treatment notes before the most recent ALJ contain evidence of a right-sided sensory deficit, while the prior ALJ did not note any sensory deficits. (Doc. No. 12 at 14.)  However, while there are several notations of a right-sided sensory deficit in the updated treatment notes, there are also numerous objective documenting no such deficit. (Tr. 442, 449, 528, 529, 535, 542.)  Thus, the ALJ's conclusion Reid's condition has not changed since the prior ALJ decision is supported by substantial evidence.

Reid nonetheless contends the "intensity of [his] treatment changed," indicating a worsening of his physical impairments.  (Doc. No. 12 at 14.)  The Court disagrees.  During the period before the prior ALJ, Reid's treatment course consisted of medications and a round of facet joint injections.  (Tr. 79-80.)  Reid argues the addition of physical therapy and a TENS unit to his treatment regimen supports a finding his condition had worsened.  (Doc. No. 12 at 14.) However, Reid fails to mention his physicians referred him to physical therapy during the prior period of adjudication, but he did not comply with this treatment recommendation.  (Tr. 80.)  The mere fact Reid now has decided to follow his doctors' recommendations regarding physical therapy does not in and of itself provide evidence his condition has worsened.  Moreover, while Reid did receive two rounds of injections since the prior ALJ decision, this is a continuation of the treatment he was already receiving at the end of the previously adjudicated period.  (Tr. 437, 439, 444, 446, 450, 452.)

With respect to his medication regimen, Reid did receive a slight increase in his Tramadol and Gabapentin in late 2014 and early 2015.  (Tr. 435, 530, 600.)  However, his

dosages for these medications have generally remained consistent.  His doctors also occasionally added other medications for pain.  (Tr. 532, 448, 586.)  The Court does not find such adjustments to be necessarily indicative of a deterioration in Reid's condition.  Morever, the record reflects his pain management doctor attempted to decrease his medication dosages in December 2015. (Tr. 543.)

Accordingly, and for all the reasons set forth above, the Court finds the ALJ did not err in determining there was no new or material evidence pertaining to Plaintiff's physical impairments during the time period at issue that would necessitate a change from the prior ALJ's RFC.

### Mental Impairments

Reid next argues the ALJ erred in determining there was no new and material evidence regarding his mental impairments.  (Doc. No. 12 at 15.)  As noted *supra*, the previous ALJ determined Reid suffered from the severe mental impairments of substance dependancy, mood disorder with depressive features, and generalized anxiety disorder.  (Tr. 72.)  The ALJ determined at step three Reid did not meet or equal the criteria of Listings 12.04, 12.06, and 12.09, finding he was mildly restricted in his activities of daily living, had mild difficulties in social functioning, and moderate difficulties with concentration, persistence, and pace.  (Tr. 75.)

At step four, the previous ALJ acknowledged Plaintiff's allegations "his impairments made it difficult for him to sleep, maintain his attention and concentration, manage his anger, and cope with anxiety."  (Tr. 77.)  He acknowledged Reid reported "racing thoughts, tended to isolate himself from others, and had difficulties recalling information from memory."  (*Id*.)  The ALJ discussed the medical evidence indicating Reid received medication, counseling, and group

31

therapy for his psychological conditions.  (Tr. 80-82.)  The ALJ addressed the opinion of consultative examiner Wayne Morse, Ph.D. and accorded it great weight, noting it was "generally consistent with treatment notes from the Giving Tree, which shows that the claimant appreciated the benefit of supportive and group counseling services, maintained the ability to interact and discuss openly difficulties in a group setting, and communicate with medical staff without disruptions in memory or concentration."  (Tr. 84.)

In the RFC, the previous ALJ limited Plaintiff as follows: "The individual is limited [to] work that is simple, routine, and repetitive tasks in a work environment that is free from fast paced production requirements, such as moving assembly lines and conveyor belts, involving only work related decisions with few, if any, workplace changes.  The individual may not engage in commercial driving and should not interact with the general public.  The individual can [have] occasional interactions with supervisors and coworkers."  (Tr. 77.)

In her May 2016 decision, the most recent ALJ also found Reid suffered from mood disorder with depressive features and generalized anxiety disorder.  (Tr. 22.)  She added the additional impairment of mild cognitive impairment.  (*Id.*)  She acknowledged the prior ALJ had not found this to be a severe impairment, but reasoned it was "accommodated by the residual functional capacity for simple, routine and repetitive tasks found in the prior decision (B1A)." (*Id*.)  She agreed with the previous ALJ that Reid did not meet or equal the criteria of Listings12.04 and 12.06, and also found Reid did not meet the criteria of Listing 12.02.  (Tr. 24.) The ALJ, similar to prior ALJ, found Plaintiff was mildly restricted in activities of daily living and social functioning, and had moderate difficulties with concentration, persistence, and pace. (*Id*.)  At step four, the ALJ evaluated the medical evidence regarding Reid's mental impairments

32

as follows:

> Turning to the claimant's mental impairments, the record shows he began undergoing treatment at a mental health clinic for depression and anxiety prior to the time period at issue in this claim (B2F, B6F). As of July of 2014, he indicated that his depression was well managed with his medications, and on August 28, 2014, the alleged onset date, he was noted to have no significant changes in his condition (B2F/13; B6F/11). At a medication review on September 16, 2014, he described mood swings and difficulty sleeping, but his mental status examination findings were generally unremarkable, including adequate recent and remote memory, adequate attention and concentration, and no signs of psychosis (B2F). Notably, he was also observed to have an upright and stable gait. His mental condition was described as stable, but in need of improvement, so Geodon was added to his medication regimen of Restoril, Celexa and Risperdal. (*Id.*) He reported this was helpful, and that his mood and sleep improved (B6F). His Celexa was subsequently changed to Prozac, and Nameda was added (*Id.*). As of March of 2015, the claimant reported he was doing very well (B15F). He indicated he was sleeping well for seven hours per night, his thought processes and mood were stable, and he was very happy with his medications, with no side effects. He continued to report doing well throughout 2015, and his sleep, appetite and mood were consistently described as stable. (*Id.*)
>
> The claimant's primary care provider repeatedly observed that he had a normal mood and affect, normal attention span, and normal concentration throughout 2014 and early 2015 (B17F/25, 43, 60, 64.) However, on July 8, 2015, the claimant was noted to lose concentration and have difficulty remembering things, and he was diagnosed with a mild cognitive impairment (*Id.*, at 74). He was prescribed donepezil, but he reported little effect (*Id.*, at 76).

(Tr. 27-28.) The ALJ then addressed nurse practitioner Krieger's March 2016 opinion, rejecting it on the basis it was inconsistent with the treatment notes documenting effective pharmacological management. (Tr. 27.) Pursuant to *Drummond,* the ALJ adopted the same mental functional limitations in the RFC as in the previous ALJ decision. (Tr. 29.)

The Court finds the ALJ's determination there was no new and material evidence demonstrating a worsening of Reid's mental impairments is supported by substantial evidence.

33

During the prior period of adjudication, Reid received counseling and medications at the Giving Tree, a mental health facility.  (Tr. 80-82.)  Similarly, during the period before the most ALJ, Reid continued to receive medications and counseling at the Giving Tree.  (Tr. 390, 392, 394.) He has begun to take Donepezil for his memory, which the ALJ acknowledged.  (Tr. 27.) However, Reid has not required any psychiatric hospitalization or inpatient care, and his treatment course has remained overall the same since the prior ALJ decision.

Moreover, the mental health treatment notes confirm his psychological condition has generally remained the same.  The treatment notes before the most recent ALJ document Reid's reports of mood swings, poor sleep, memory problems, and depression.  (Tr. 390, 392, 394, 398, 401, 563, 565.)  These symptoms were acknowledged and discussed by both ALJs.  (Tr. 81-82, 26-28.)  Treatment notes from both relevant periods reveal his medications improve his symptoms.  (Tr. 81, 563.)

Plaintiff asserts remand is required, however, because during the relevant time period, Ms. Krieger administered "multiple medication changes."  (Doc. No. 12 at 16.)  The Court is not persuaded by this argument.  It is true during the time frame of July 2014 through January 2015, Ms. Krieger regularly adjusted Reid's medications.  (Tr. 387, 390, 392, 395, 398, 401.) However, Reid required medication adjustments during the prior period of adjudication as well. (Tr. 81.)  Moreover, from January 2015 through September 2015, his medications remained the same.  (Tr. 401, 563, 565, 567, 569.)  Reid even indicated to Ms. Krieger in March 2015 he was "very happy with [his] medication."  (Tr. 563.)  Ms. Krieger switched Reid's antidepressant in November 2015, but it was at pain management's request, not because his mental health symptoms had increased.  (Tr. 571.)  She continued Reid on these same medications in January

34

2016.  (Tr. 574.)  These treatment notes indicate Reid remained stable on his medications for a year and do not support a finding Reid's condition worsened since the last ALJ decision.

Reid also argues the ALJ erred in according little weight to the opinion of treating nurse practitioner Ms. Krieger.  (Doc. No. 12 at 16.)  As noted *supra*, Ms. Krieger provided the following opinion regarding Reid:

- He can consistently understand, remember, and follow one or two step instructions;

- He would be off-task 10 -15% of the workday;

- He requires close supervision (re-direction multiple times per day, on a continuing basis) in order to stay on task;

- He would be absent, late, or leave early at least twice a month due to psychiatric based symptoms;

- He is unable to consistently interact with others in a manner that is appropriate to customer expectations, and would not be successful in working with the public;

- He can occasionally have superficial interactions with co-workers and supervisors; and

- He is unable to perform a job at an average-paced job without a reduction in productivity of 15-20% compared to an unimpaired worker.

(Tr. 576-577.)  The ALJ rejected this opinion on the basis it was "not consistent with her own treatment records, which consistently indicate the claimant is doing well on medications, with a stable mood and improved sleep, and that he is happy with his medications and has no side effects, as discussed above (B6F, 15F)."  (Tr. 27.)  The ALJ also noted Ms. Krieger, as a nurse, was not an "acceptable medical source," for purposes of considering medical opinions.  (*Id*.)

Under Social Security Regulations, a nurse practitioner is not an "acceptable medical

35

source" entitled to the type of "controlling weight" an "acceptable medical source" enjoys. *See* 20 C.F.R §§ 416.902(a)(1) - (8), 416.927(a)(1), 416.927(f).[5] However, the regulations also provide these opinions still must be considered, using the same factors listed in 20 C.F.R. §416.927(c). The regulations further provide "not every factor for weighing opinion evidence will apply in every case" and the "adjudicator generally should explain the weight given to opinions from these source or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicators's reasoning." 20 C.F.R. §416.927(f)(1)-(2).

Social Security Ruling 06-03[6] further explains how opinion evidence from "other sources" should be treated. SSR 06-03p provides information from "other sources" (such as a chiropractor) is "important" and "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." SSR 06-03p, 2006 WL 2329939 at *2-3 (August 9, 2006). Interpreting this SSR, the Sixth Circuit has found opinions from "other sources" who have seen the claimant in their professional capacity "should be evaluated using the applicable factors, including how long the source has known the individual, how consistent the opinion is with other evidence, and how well the source explains the opinion." *Cruse v. Comm'r of Soc. Sec.,* 502 F.3d 532, 541 (6th Cir. 2007) ("Following SSR 06-03p, the ALJ should have discussed the factors relating to his treatment of Hasselle's assessment, so as to have provided some basis for why he was rejecting the opinion"). *See also Williams v. Colvin,* 2017

---

[5]     For claims filed prior to March 27, 2017. *See* 20 C.F.R. §§ 416.902(a)(7).

[6]     The Court notes SSR 06-03p was rescinded on March 27, 2017. This rescission is effective for claims filed on or after March 27, 2017. SSR 96-2p, 2017 WL 3928298 at *1.

WL 1074389 at *3 (N.D. Ohio March 22, 2017).

The Court finds the ALJ properly discounted Ms. Krieger's opinion.  As set forth above, the ALJ acknowledged Ms. Krieger's opinion and rejected it based upon its inconsistency with the treatment notes.  As noted *supra*, the ALJ is charged with generally explaining the weight given to opinions from other sources, or "otherwise ensur[ing] that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicators's reasoning."  20 C.F.R. §416.927(f)(1)-(2).  The ALJ's discussion of the opinion complies with this regulation, as well as the factors set forth in SSR 06-03p.

Further, the ALJ's evaluation of Ms. Krieger's conclusions are supported by substantial evidence.  The record reflects Reid saw Ms. Krieger on a monthly basis for medication management.  (Tr. 390, 392, 395, 398.)  While Reid consistently reported issues with his memory, he also indicated his medications stabilized his mood.  (Tr. 392, 395, 398.)  In March 2015, Ms. Krieger noted Reid was "doing very well" and was "very happy" with his medication regimen.  (Tr. 563.)  While his memory continued to be poor, his attention span and concentration were fair.  (*Id*.)  In June 2015, Ms. Krieger found Reid's recent and remote memory to be "good" and his mood stable.  (Tr. 567.)  In November 2015, Reid reported he was "stable" and "doing well."  (Tr. 571.)

Plaintiff directs this Court's attention to several parts of the record in which he reports he requires assistance from his friend to manage his medications, schedule, and appointments.  (Doc. No. 12 at 17.)  As an initial matter, the ALJ did consider Reid's allegations of memory problems and the need for assistance in his daily routine.  (Tr. 26.)  Moreover, although Reid cites evidence from the record he believes supports a finding of greater mental restrictions, the

37

findings of the ALJ "are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001).  Indeed, the Sixth Circuit has made clear an ALJ's decision "cannot be overturned if substantial evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  In this matter, the ALJ clearly articulated her reasons for discounting Ms. Krieger's conclusions and those reasons are supported by substantial evidence.

In sum, it is Reid's burden to introduce substantial evidence of the changed conditions in order to "escape the *res judicata* effect of the previous findings." *Davis v. Comm'r of Soc. Sec.*, 2017 WL 4348919 *2 (N.D. Ohio Sept. 29, 2017).  Reid has failed to do so here. Accordingly, and for all the reasons set forth above, the Court finds the ALJ did not err in determining there was no new or material evidence pertaining to Reid's mental impairments during the time period at issue which would necessitate a change from the prior ALJ's RFC. Reid's assignment of error is without merit.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.


                                            *s/Jonathan D. Greenberg*
                                            Jonathan D. Greenberg
                                            United States Magistrate Judge
Date: May 16, 2018

38

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).